IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 25, 2002

## STATE OF TENNESSEE v. HOWARD DUTY, JR.

**Appeal from the Criminal Court for Sullivan County**
**No. S44,705     R. Jerry Beck, Judge**

**No. E2001-03008-CCA-R3-CD**
**November 13, 2002**

A Sullivan County Criminal Court jury convicted the defendant, Howard Duty, Jr., of stalking, a Class A misdemeanor, and the trial court sentenced him to eleven months, twenty-nine days at seventy-five percent and imposed a one thousand dollar fine. The defendant appeals, claiming (1) that the evidence is insufficient to support his conviction, (2) that his sentence is excessive, and (3) that he should have received an alternative sentence. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES and ALAN E. GLENN, JJ., joined.

Stephen M. Wallace, District Public Defender, and Terry L. Jordan, Assistant Public Defender, for the appellant, Howard Duty, Jr.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and B. Todd Martin, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the stalking of James Carroll Martin. Mr. Martin testified that he met the defendant in June or July 1998 and that they had a sexual relationship in September and October 1998. The victim acknowledged that after he ended the relationship in October 1998, he saw the defendant around the victim's home on Bristol Avenue in Blountville. He said that one time, he saw the defendant walk by his house and that he went outside and asked the defendant what he was doing there. He said the defendant did not answer him and reached into the defendant's back pocket like he was going to pull out something. He said that in the fall of 2000, the defendant started driving by his house. He said that the defendant would drive by about four days per week and that sometimes the defendant would drive by five or six times a day. He said the defendant often circled his neighborhood and parked in a parking lot near his home. He said the defendant also played

basketball on a court at Blountville Middle School and that he could see the basketball court from his backyard and bedroom window. He said that sometimes the defendant would stop playing basketball and stare at his house for five or ten minutes. He said that the defendant had assaulted him twice and that he wanted to stay away from the defendant.

The victim testified that on November 4, 2000, he was driving home on Highway 126. He said he saw the defendant's Toyota pickup truck leave the Food Country parking lot on Highway 126 and turn onto School Street. He said he wanted to turn onto School Street to go home but did not want to follow the defendant. He said he stopped at the Dollar Store, waited in the store's parking lot for a few minutes, and then turned onto School Street. He said that he saw the defendant's truck in a parking lot on School Street and that the truck was facing his house. He said that when he turned onto Bristol Avenue, he saw the defendant driving toward him from the opposite direction. He said he and the defendant stopped in front of his house. He said that he turned in front of the defendant to pull into his driveway and that the defendant accelerated and hit his truck's passenger side. He said that he went into his home and telephoned the police. He said that he stayed in his house until the police arrived and that he did not approach the defendant because he was afraid of him.

On cross-examination, the victim testified that he was six feet tall and weighed one hundred seventy pounds and that he did not live on Bristol Avenue at the time of his relationship with the defendant. He acknowledged that between October 1998 and November 4, 2000, the defendant walked by his house only once. He also acknowledged that he had filed two prior warrants against the defendant for assault and that the defendant had been found not guilty of those offenses.

The victim testified that before he pulled into his driveway on November 4, he turned on his turn signal. He said that after the defendant hit him, he went into his home and watched the defendant from his window. He said the defendant went to three of his neighbors' homes but did not try to come into his house. He said that although his truck received about one thousand dollars in damages, he was not physically injured by the defendant.

Connie Rivera testified that she had lived next door to the victim since November 1999. She said that the first time she ever saw the defendant, he was standing in the victim's driveway and arguing with the victim. She said that when she and her son went outside, the defendant left the driveway and walked up Bristol Avenue. She said that on weekends, she would see the defendant drive by the victim's home three or four times a day. She said that when she and her neighbors saw the defendant's truck in the neighborhood, they would take their children inside. She said that the defendant would park his truck in a parking lot behind the victim's house and sit in the truck. She said that she also saw the defendant at a basketball court about fifteen times and that a person could see the victim's house from the basketball court. On cross-examination, Ms. Rivera acknowledged that a row of houses and a large grassy area separated the victim's home from the basketball court and that the basketball court was "a pretty good distance away."

Nick Rivera, Connie Rivera's fifteen-year-old son, testified that he had seen the defendant drive by the victim's house four or five times a day and that he had seen the defendant play basketball at the court next to Blountville Middle School about four times. He said that on November 4, 2000, he was at home watching television and heard the victim's truck on Bristol Avenue. He said he looked outside and also saw the defendant's truck. He said the victim and the defendant were driving very slow. He said that when the victim turned into the victim's driveway, the defendant sped up and hit the victim's truck. He said that he went outside and that the victim ran into the victim's home. He said the defendant was yelling and told him to call the police. On cross-examination, he acknowledged that he and the victim were friends and that the defendant waited at the scene until the police arrived.

Detective Dennis Allen Doran of the Sullivan County Sheriff's Department testified that several days after the defendant hit the victim's truck, he began investigating the defendant's stalking the victim. He said that the defendant lived eight to twelve miles from the victim and that at least two basketball courts were closer to the defendant's home than the basketball court at Blountville Middle School. He said that based on his investigation, he charged the defendant with stalking the victim.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant claims that the evidence is insufficient to support his conviction. Specifically, he contends that the distances from the parking lot and the basketball court to the victim's house were too remote to satisfy the "follows" element for a stalking offense. In support of his argument, he relies on an aerial photograph of the victim's neighborhood that the state introduced into evidence. The photograph shows that the distances from the parking lot and the basketball court to the victim's property are approximately two hundred fifty feet and five hundred feet, respectively. The state claims that the evidence is sufficient. We agree with the state.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

"A person commits the offense of stalking who intentionally and repeatedly follows or harasses another person in such a manner as would cause that person to be in reasonable fear of being assaulted, suffering bodily injury or death." Tenn. Code Ann. § 39-17-315(a)(1). Further,

> (A) "Follows" means maintaining a visual or physical proximity over
> a period of time to a specific person in such a manner as would cause

a reasonable person to have a fear of an assault, bodily injury or death;

(B) "Harasses" means a course of conduct directed at a specific person which would cause a reasonable person to fear an assault, bodily injury, or death, including, but not limited to, verbal threats, written threats, vandalism, or unconsented-to physical contact; and

(C) "Repeatedly" means on two (2) or more separate occasions.

Tenn. Code Ann. § 39-17-315(a)(2)(A)-(C).

Viewed in the light most favorable to the state, the evidence shows that the defendant stalked the victim. In the fall of 2000, the defendant repeatedly drove by the victim's house. In addition, the defendant repeatedly watched the victim's house from a parking lot and a basketball court. Although the parking lot and the basketball court were five hundred and two hundred fifty feet away from the victim's home, the victim could see those locations from his backyard and bedroom window and observed the defendant watching his house. The victim testified that he was afraid of the defendant and that one time when he approached the defendant, the defendant reached into his back pocket like he was going to pull out something. On November 4, the defendant saw the victim driving on School Street, met the victim on Bristol Avenue, and intentionally rammed the victim's truck. We conclude that a rational jury could have found beyond a reasonable doubt that the defendant repeatedly maintained a visual and physical proximity to the victim and that the victim reasonably feared being assaulted by him. The evidence is sufficient to support the defendant's conviction.

## II. EXCESSIVE SENTENCE

Next, the defendant contends that his sentence is excessive. He claims that in sentencing him to eleven months, twenty-nine days at seventy-five percent, the trial court failed to consider his remorse for the crime and the fact that he did not threaten or harm the victim. The state claims that the trial court properly sentenced the defendant. We agree with the state.

At the sentencing hearing, the state and the defendant relied on the presentence report. According to the report, the then forty-eight-year-old defendant received disability benefits and worked by mowing lawns and doing odd jobs. He described his physical and mental health as fair and stated that he had received mental health counseling. In the report, the defendant stated, "I meant no harm to Mr. Martin. If a crime was committed, I am sorry that it happened. The wreck was an unavoidable accident." The defendant's criminal history takes up nine pages of the report and includes prior convictions in Virginia and Tennessee for aggravated assault, assault, theft of property valued over ten thousand dollars but less than sixty thousand dollars, evading arrest, marijuana possession, disorderly conduct, public intoxication, and several traffic offenses. The report reveals that the defendant has been committing crimes since he was eighteen years old.

The trial court stated that the defendant had a "horrendous record of prior convictions" and that there was "very little that would mitigate against reduction of the . . . potential eleven (11) months and twenty nine (29) days." It ruled that the manner in which the offense was committed and the defendant's prior criminal record justified his serving eleven months, twenty-nine days at seventy-five percent.

Appellate review of sentencing is <u>de novo</u> on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure and it gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, as amended, we may not disturb the sentence on appeal. <u>See</u> <u>State v. Fletcher</u>, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In misdemeanor sentencing, in determining the percentage, if any, of the sentence to be served in confinement, the court shall consider the purposes of the Sentencing Act, the principles of sentencing, and the enhancement and mitigating factors. <u>See</u> Tenn. Code Ann. § 40-35-302(d); <u>State v. Troutman</u>, 979 S.W.2d 271, 273-74 (Tenn. 1998). A Class A misdemeanant may be incarcerated for up to eleven months and twenty-nine days. Tenn. Code Ann. § 40-35-111(e)(1). We note that there is no presumptive minimum sentence provided by law for misdemeanor sentencing. <u>See, e.g.</u>, <u>State v. Creasy</u>, 885 S.W.2d 829, 832 (Tenn. Crim. App. 1994).

In this case, the trial court determined that the defendant's extensive criminal record and the manner in which he stalked the victim justified the maximum punishment of eleven months, twenty-nine days at seventy-five percent. Based upon the record before us, especially the defendant's extensive criminal history, we agree. Although the defendant claims that the trial court failed to consider his remorse and the fact that he did not harm the victim, we believe that his statements in the presentence report that "if a crime was committed, I am sorry" and the "wreck was an unavoidable accident" show that he has not accepted responsibility for his actions. We conclude that he has failed to show that the length of his sentence is excessive.

### III. ALTERNATIVE SENTENCING

Finally, the defendant claims that the trial court erred by ordering him to serve his sentence in confinement. He contends that he is entitled to probation or some other form of alternative sentence because he has expressed remorse for his actions, did not threaten to harm the victim, and has committed no serious offenses since 1995. The state contends that the trial court properly denied alternative sentencing. We agree with the state.

When determining if incarceration is appropriate, a trial court should consider that (1) confinement is needed to protect society by restraining a defendant who has a long history of criminal conduct, (2) confinement is needed to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to people likely to commit similar offenses, or (3) less restrictive measures than confinement have frequently or recently been

applied unsuccessfully to the defendant. <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (citing Tenn. Code Ann. § 40-35-103(1)(A)-(C)). Additionally, a trial court should consider a defendant's potential or lack of potential for rehabilitation. Tenn. Code Ann.§ 40-35-103(5).

The trial court stated that the defendant was entitled to probation. <u>See</u> Tenn. Code Ann. § 40-35-303(a) (providing that a defendant is eligible for probation for a sentence of eight years or less). However, it noted that the defendant had an extensive criminal history and no employment other than mowing yards and doing odd jobs. It found "almost nothing of a positive nature" in the presentence report and stated that the "negative factors outweigh any positive factors in the extreme." The trial court denied the defendant's request for an alternative sentence.

We conclude that the trial court did not err in ordering the defendant to serve his sentence in incarceration. The defendant has prior felony and misdemeanor convictions that span nine pages of his presentence report. As noted above, the defendant's statements in his presentence report indicate that he has not acknowledged committing a crime and that he does not reflect a high potential for rehabilitation. <u>See</u> <u>State v. Dowdy</u>, 894 S.W.2d 301, 306 (Tenn. Crim. App. 1994) (holding that a defendant's failure to accept responsibility for a crime is germane to his rehabilitation potential). We affirm the trial court's denial of the defendant's request for an alternative sentence.

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, JUDGE